UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR-06-57-B-W |
| | ) | |
| WILLIAM C. BURHOE | ) | |

**ORDER ON *SELL* HEARING**

Applying *Sell v. United States*, 539 U.S. 166 (2003), the Court finds that the Government has established each *Sell* criterion by clear and convincing evidence and authorizes the Government to involuntarily medicate the Defendant to restore his mental competency to stand trial.

**I.     STATEMENT OF FACTS**

   **A.  A Delayed Process**

The intersection between a crime premised on underlying mental illness and the defendant's competency is inherently problematic.  William C. Burhoe, a man who carries the diagnosis of schizophrenia, paranoid type, should not possess a firearm.  On September 7, 2006, a federal grand jury alleged that having previously been committed to a mental institution, he possessed, on June 6, 2006, both a Remington Model 721, .270 rifle, and a Midland-Armsport Model 1126, twelve-gauge shotgun, an alleged violation of 18 U.S.C. § 922(g)(4).  *Indictment* (Docket # 1).  Whether Mr. Burhoe is or can be made competent to stand trial has proven to be complicated and intractable, so much so that over two years since indictment he remains in custody and issues regarding his competency remain unresolved.  The case finally culminated on July 2, 2008 in a *Sell* hearing, requiring the Court to decide whether to force Mr. Burhoe to undergo a recommended protocol of psychiatric medication against his wishes.

The road to the *Sell* hearing has been circuitous. Shortly after the September 7, 2006 Indictment, the Government moved for a psychiatric examination, but after the Court issued an order, Mr. Burhoe objected, contending that the federal government should be required to use a prior state psychiatric report. *Mot. for Pretrial Psychiatric or Psychological Evaluation* (Docket # 8); *Order* (Docket # 10); *Def.'s Mot. to Reconsider Order for Competency Evaluation* (Docket # 12). On November 8, 2006, the Court denied the motion for reconsideration and Mr. Burhoe was subsequently sent to Devens Federal Medical Center for a § 4241 evaluation. *See* 18 U.S.C. § 4241.

To perform the evaluation, it was necessary for the government psychologist to review Mr. Burhoe's past medical and health care records and the Court's October 6, 2006 Order required him to sign appropriate confidentiality releases. *Order* at 2 (Docket # 10). Mr. Burhoe refused to sign the releases and on January 12, 2007 the Government moved for an order compelling production of the documents. *Mot. for Order to Produce Medical Records* (Docket # 26). On January 19, 2007, Mr. Burhoe objected to the motion. *Def.'s Resp. to Gov't's Mot. for Order to Produce Records* (Docket # 27). On January 29, 2007, the Court granted the Government's motion. *Order on Mot. for Order to Produce Medical Records* (Docket # 29). The Government's psychologist filed his report on March 19, 2007 and a competency hearing was held on June 15, 2007. The Court concluded that Mr. Burhoe was not competent to stand trial and ordered him hospitalized for suitable treatment. *Order* (Docket # 42).

In the fall of 2007, the Court received a competency restoration report from the doctors at the Federal Medical Center in Butner, North Carolina. Concerned the report implicated *Sell*, the Court suggested a more detailed expert opinion; on November 7, 2007, the Government moved for a supplemental report, which the Court granted on November 13, 2007. *Mot. for*

*Supplemental Report* (Docket # 52); *Order for Supplemental Report* (Docket # 62). While awaiting the supplemental report, on February 12, 2008, Mr. Burhoe moved for an order to skip the competency hearing altogether and to proceed directly to the § 4246 hospitalization procedure. *Def.'s Mot. for a § 4246 Hospitalization Proceeding* (Docket # 69). On February 27, 2008, the Court denied Mr. Burhoe's motion for a § 4246 hospitalization. *Order* (Docket # 80). The *Sell* hearing was set for April 24, 2008 to allow Mr. Burhoe to be physically present and subsequently continued to July 2, 2008 at his request.

After the July 2, 2008 *Sell* hearing, Mr. Burhoe challenged the credibility of one of the Government experts; he requested that further treatment records be produced and that the *Sell* hearing be reopened to allow for further cross-examination. *Def.'s Mot. to Reopen Sell Hr'g* (Docket # 98). After the additional records were produced, Mr. Burhoe on September 11, 2008 withdrew his request to reopen the *Sell* hearing. *Withdrawal of Mot.* (Docket # 105). On September 11, 2008 and September 16, 2008, the Defendant and the Government respectively filed memoranda, outlining their positions on the question of involuntary medication. *Addendum to Def.'s Closing Argument in Sell Hr'g* (Docket # 106); *Gov't's Resp. to Addendum to Def.'s Closing Argument in Sell Hr'g* (Docket # 107).

### B. The Defendant's Psychiatric Condition and Past Treatment

William Burhoe is a fifty-three year-old man, who grew up in western Maine in an intact family. He first experienced mental health problems in his mid-twenties and underwent his first mental health treatment in 1984, when he was treated as an outpatient at a local hospital. Mr. Burhoe has a family history of bipolar disorder, including an afflicted cousin, and two suicides on his father's side, an uncle and grandfather.

From July 20, 1997 to August 25, 1997 Mr. Burhoe was involuntarily hospitalized at Jackson Brook Institute, due to his family's concern about his deteriorating mental health. He had been acting bizarrely and was frequently firing a gun outside his home. When the state of Maine Department of Human Services removed his firearms, Mr. Burhoe became angry and went to his parents' home, looking for his firearms. He assaulted his father and tore the phone off the wall, so that his parents could not call the police. His parents drove to the police station and the police arrested Mr. Burhoe for assault. He was then involuntarily committed.

On August 25, 1997, Mr. Burhoe was transferred to the Augusta Mental Health Institute (AMHI), where he remained hospitalized until September 18, 1997. The psychiatric records state that he had been living alone in a house without electricity or amenities for seven years; during his hospitalization, he displayed strong and resistant delusions and was diagnosed with either paranoid schizophrenia or delusional disorder.[1]

On June 6, 2006, Mr. Burhoe was shot during an altercation with the police. He was later transferred to Central Maine Medical Center, where he underwent medical and mental health treatment, and was again diagnosed with paranoid schizophrenia. He was transferred briefly to Franklin County Jail, but on June 29, 2006 he was sent to the Riverview Psychiatric Center (formerly AMHI), where he remained hospitalized until July 20, 2006. During that hospitalization, he reported beliefs that the police and the government were conspiring against him. He was diagnosed with schizophrenia, paranoid type, and he was given a rule out diagnosis of delusional disorder and alcohol abuse by history. Upon discharge he returned to Franklin County Jail, where he exhibited signs of paranoia and refused medicine. At some point, the state of Maine brought criminal charges against Mr. Burhoe, including aggravated attempted murder

---

[1] The forensic report dated March 8, 2007 says he was diagnosed with paranoid schizophrenia; the forensic evaluation dated October 16, 2007 says he was diagnosed with delusional disorder. *Compare* Gov't Ex. 1 at 4, *with* Gov't Ex. 3 at 3.

and reckless conduct. A state-ordered psychiatrist concluded that Mr. Burhoe was not competent to stand trial.

Following initiation of this prosecution by indictment on September 7, 2006, and pursuant to the Court's October 6, 2006 Order, Mr. Burhoe was admitted to the Devens Federal Medical Center from January 5, 2007 to February 20, 2007. This admission resulted in a forensic report from Shawn Channell, Ph.D., a Bureau of Prisons psychologist. Gov't Ex. 1. Dr. Channell diagnosed schizophrenia, undifferentiated type, and alcohol abuse by history. Dr. Channell concluded that Mr. Burhoe was not competent to stand trial because of his delusional beliefs and disorganization, and he recommended inpatient treatment. The Court accepted Dr. Channell's recommendations and ordered restorative treatment.

Mr. Burhoe was admitted to the Mental Health Department of the Federal Medical Center in Butner, North Carolina on August 3, 2007 to undergo evaluation and treatment. After evaluation, he was prescribed risperidone, an antipsychotic medication. Mr. Burhoe initially agreed to take the medication. After approximately two weeks of partial compliance, he refused to continue the risperidone. He had complained that the medication made him feel "antsy" or "foggy" and attempts to adjust the dosage to respond to his complaints were unsuccessful. On September 26, 2007, the medication was formally discontinued.

After September 26, 2007, he was enrolled in a competency restoration group, but his behavior became progressively disruptive. He became argumentative and had trouble staying on topic. He often yelled and cursed and had to be frequently redirected. On the other hand, he continued to follow institutional rules and for the most part got along well with other patients.

### C.  The Treatment Recommendation

In their October 25, 2007 forensic evaluation, Jill R. Grant, Psy. D., a staff psychologist at Butner, and Bruce R. Berger, M.D., a staff psychiatrist, recommended the involuntary administration of medication for Mr. Burhoe.  Gov't Ex. 3.  They opined that it is unlikely that Mr. Burhoe will respond to alternative, less intrusive treatments and that he has been non-compliant in the past with medication recommendations, thereby necessitating the involuntary administration of medication to assure compliance.  They wrote that there is "a substantial probability that Mr. Burhoe's competency can be restored with a period of treatment with antipsychotic medication and possible antidepressant medication."  *Id.* at 12.

### D.  The *Sell* Criteria

Under *Sell v. United States*, a court must consider four factors before ordering the involuntary medication of a defendant:  (1) the court must find *important* governmental interests are at stake; (2) the court must find that "involuntary medication will *significantly further* those concomitant state interests"; (3) the court must find that "involuntary medication is *necessary* to further those interests"; and, (4) the court must find that "administration of the drugs is *medically appropriate*."  539 U.S. 166, 211-13 (2003).

### E.  The Supplemental Report

#### 1.  The Proposed Treatment – An Overview

On February 8, 2008, Drs. Grant and Berger issued a supplemental report, extensively discussing their involuntary treatment recommendation against the four *Sell* factors.  Gov't Ex. 5.  They described in detail the proposed treatment plan.  The doctors proposed showing Mr. Burhoe the court order for involuntary medication and attempting to enlist his agreement to take the

6

recommended medication orally.[2]  *Id.* at 17.  If Mr. Burhoe refused to accept the treatment, the doctors recommended that a long-acting antipsychotic medication, either haloperidol decanoate or risperidone, be injected.  *Id.* at 19-20.  They estimated the course of involuntary medication would require "at least three to four months of continuous treatment at an adequate dosage."  *Id.* at 20.

### 2.  The First *Sell* Criterion – The Importance of the Governmental Interest

The doctors deferred comment on the first *Sell* criterion, the importance of the governmental interests, as a legal concern beyond their professional expertise.  *Id.* at 2.

### 3.  The Second *Sell* Criterion – Whether Involuntary Treatment Will Significantly Further The Governmental Interests

The doctors thoroughly addressed the second criterion, whether involuntary treatment will significantly further the state interests.  Reviewing the psychiatric literature, they concluded that the relevant studies "provide empirical support for the opinion that Mr. Burhoe's competency to stand trial is 'substantially likely' to be restored with treatment with antipsychotic medication."  *Id.* at 5.  They noted that the range of satisfactory outcomes for people with Mr. Burhoe's condition runs from a high of 90% to a low of 40%.  *Id.* at 6.  The doctors dispelled the concern that these medications would have an adverse impact on Mr. Burhoe's cognition.  *Id.* at 8.  To the contrary, they concluded that Mr. Burhoe's cognition will likely improve with medication and they quoted a recent article that described the drugs as "mind-saving."  *Id.*

The doctors reviewed the possibility of neuromuscular side effects.  *Id.* at 8-9.  They acknowledged that some recommended medications pose a risk of neuromuscular side effects, the most dramatic of which are sustained contraction of various muscle groups potentially including muscles of the jaw, back, neck, eyes, and tongue, and that these dystonic reactions can

---

[2] The doctors recommend daily doses of risperidone, aripiprazole, ziprasidone, olanzepine, perphenazine, fluphenazine, and haloperidol.  Gov't Ex. 5 at 17-18.

be frightening to the patient. On the other hand, they noted that the likelihood of such a response is from 2% to 50%, depending upon which generation of antipsychotic medication is necessary. *Id.* They also said that these symptoms can be quickly and easily treated. *Id.* There are some delayed onset neuromuscular side effects, which are rarer and can be addressed by altering the dose. *Id.* at 10.

The doctors also discussed the possibility of metabolic side effects, such as weight gain, diabetes, and elevated serum lipids. *Id.* The risk of such side effects can be minimized by avoiding certain medications; nonetheless, the doctors recommended continuous monitoring of the patient under the "standard protocol at FMC Butner." *Id.*

There is a risk of rare, but dangerous side effects. The doctors prefaced this discussion by observing that the baseline mortality risk in schizophrenia is "significantly higher than that in the general population"; specifically, schizophrenics have a fourfold greater risk of death by unnatural causes when compared with the expected rate. *Id.* at 11. With this said, between 0.07% and 2% of patients treated with antipsychotic medication develop a dangerous condition called neuroleptic malignant syndrome, which is potentially life-threatening. *Id.* at 12. The doctors said that of those patients who develop this syndrome, there is a mortality rate between 10% and 20%. *Id.* There is also the possibility of death from cardiac arrhythmia. *Id.* The risk of sudden death in the general population is seven events per 10,000 person years, compared to ten to fifteen events per 10,000 person years in populations being treated with antipsychotic medication. *Id.*

### 4. The Third *Sell* Criterion – Whether Involuntary Medication Is Necessary to Further the Governmental Interests

The *Sell* Court discusses one alternative to be considered before more intrusive medication methods: "a court order to the defendant backed by the contempt power." *Sell*, 539

U.S. at 212. The doctors pointed out that "there is no compelling evidence that an incompetent defendant should reasonably be expected to have the mental capacity to understand the implications of a contempt order as a basis for making a rational decision on whether to comply with it." Gov't Ex. 5 at 13. They point to two instances at Butner where this procedure had been tried without success, and note that the contempt procedure succeeded only in significantly delaying involuntary treatment. *Id.* They emphasize that "in conjunction with Mr. Burhoe's strongly expressed opposition to the proposed treatment . . . a contempt order is unlikely to achieve the same results as a court order for involuntary treatment." *Id.* at 14.

The other option is psychotherapy. The doctors observed that the past debate within the psychiatric community about the relative value of drugs versus psychotherapy "collapsed in the 1980s under the weight of the data." *Id.* They acknowledged, however, that psychotherapy can be an effective adjunct to medication, encouraging the patient to adhere to the medication protocol. *Id.*

### 5. Fourth *Sell* Criterion – Medical Appropriateness

The doctors concluded that the administration of antipsychotic medication is "an essential element in the treatment of [schizophrenia and related psychotic disorders]." *Id.* at 15. They reviewed the effectiveness of various types of medication and rejected one, clozapine, as inappropriate. *Id.* They concluded that "administering antipsychotic medication to Mr. Burhoe is medically appropriate." *Id.* at 16.

### F. The *Sell* Hearing – July 2, 2008

On July 2, 2008, the Court conducted a *Sell* hearing; Mr. Burhoe was present, was represented by counsel, and testified. The Government called Drs. Grant and Berger by videoconference.

9

### 1. Dr. Grant's Testimony

Dr. Grant reiterated the opinions in her two joint reports, expressing the hope that if Mr. Burhoe were medicated, it would "help minimize, reduce, or may even totally wipe out altogether his delusional thinking and paranoid ideation so that he is able to think more rationally about his situation. We would also hope that he could gain more insight into his mental illness and stay on medication so that he could think more rationally over time." *Test. of Jill Grant, Ph.D.* at 14:21-25; 15:1-2 (Docket # 104).

On cross-examination, Dr. Grant acknowledged that when Mr. Burhoe voluntarily took risperdone, he complained of and exhibited a blunted affect or sedation. *Id.* at 18:17-25; 19:1-22. She was not certain, however, whether the blunted affect was caused by the risperdone. *Id.* at 19:23-25; 20:1. A question was raised about how many times Dr. Grant had actually met with Mr. Burhoe. *Id.* at 22:22-25; 23:1-13.

### 2. Dr. Berger's Testimony

On direct examination, Dr. Berger explained the protocol for the involuntary administration of antipsychotic medication. *Test. of Bruce R. Berger, M.D.* at 29:18-25; 30:1-25; 31:1-21 (Docket # 104). Although acknowledging a degree of uncertainty, Dr. Berger opined that Mr. Burhoe's likelihood of restoration is about 70% to 75%. *Id.* at 32:4-10. He stated that the treatment would take anywhere from two to six months or more. *Id.* at 32:17-24. On cross-examination, Dr. Berger was asked whether Mr. Burhoe fell into a subcategory of patients with schizophrenia whose likelihood of recovery was substantially less than 75%. *Id.* at 34:22-25; 35:1-17. He said that it appeared the subgroup, which had prior lengthy hospitalizations and very low cognitive skills, did not fit Mr. Burhoe, but he admitted that "the more information you have the better." *Id.* at 35:2-21. He also acknowledged that he did not know for sure whether

Mr. Burhoe would be restored to competency, and added that although they have "restored the majority of people[,] [s]ome people are not restorable." *Id.* at 38:16-22. He otherwise reiterated and elaborated upon the contents of his reports.

### 3. Mr. Burhoe's Testimony

Mr. Burhoe made it clear that he does not want to take the recommended medication. He has had bad experiences with prior medication. He said that he was prescribed green anti-anxiety pills, and they caused muscle contractions and caused him to suffer. *Test. of William C. Burhoe* at 13:13-25; 14:1-2 (Docket # 101). He also said that the pills make him "so drugged up you couldn't possibly win a courtroom battle on the - - on the prescription drugs." *Id.* at 14:10-11.

Turning to his experience with risperidone at Butner, he complained that the medication "drugs you up. It makes you feel vulnerable." *Id.* at 15:19. He also said that the risperidone caused him to suffer and "makes you [feel] miserable inside." *Id.* at 17:3, 12. He noted that "80 percent of the people in jail are there because they're doing drugs. I'm there because I won't do drugs, can't do drugs; I've been told all my life by my own doctors." *Id.* at 18:3-6.

Mr. Burhoe's dislike for medication was clear; the rest of his testimony, however, confirmed the accuracy of the diagnosis. He engaged in an odd, disjointed ramble. He testified that "the police have got an alibi or an opportunity to - - to avoid my testimony and my knowledge of their criminal history." *Id.* at 12:10-12. He said that his "personality has shortfalls because I get cold - - like a woman gets cold, and I don't have difficulty negotiating personal relationships because I cannot see what's going on." *Id.* at 12:24-25; 13:2-4. He described having knowledge of "these criminal deaths in the community and you can't get nobody interested in doing nothing into bringing these people to justice." *Id.* at 14:3-6. He then lapsed

into a barely coherent monologue about the death of his neighbor's daughter's boyfriend, about somebody "with a knife [who] was threatening," about a young lady who had been "shot in the head in the bedroom of - - I mean, the bathroom of her home," and about a "scheme of what was going on in the community." *Id.* at 23:21-25; 24:1-25: 25:1-25; 26:1.

## II.     DISCUSSION

### A. Applicability of *Washington v. Harper*

In *Sell*, the United States Supreme Court emphasized that its four criteria are to be applied to determine "whether involuntary administration of drugs is necessary significantly to further a particular governmental interest, namely, the interest in rendering the defendant *competent to stand trial*."  See *Sell*, 539 U.S. at 181.  Before proceeding to this analysis, the court should first consider whether forced medication is warranted "for a *different* purpose, such as the purposes set out in *Harper* related to the individual's dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his health gravely at risk." *Id.* at 181-82.  *Sell* noted that there are "often strong reasons for a court to determine whether forced administration of drugs can be justified on these alternative grounds *before* turning to the trial competence question." *Id.* at 182.

In *Harper*, the Supreme Court found constitutional a Washington state policy that allowed prison officials to administer medication to inmates against their will if a physician determined that the inmate needed the medication, suffered from a mental disorder, and was gravely disabled or presented a likelihood of serious harm to himself, others, or their property. *Washington v. Harper*, 494 U.S. 210, 215 (1990).  Observing that Mr. Burhoe had been able to function adequately in the open population of the Mental Health Department without endangering himself or others, the Butner mental health professionals concluded that he "does

not currently meet the criteria for involuntary treatment under the grounds of *Washington v. Harper*." Gov't Ex. 5 at 2.  The Court agrees.

### B. The Burden of Proof

*Sell* did not specify the burden of proof that the Government must meet to obtain an order of involuntary medication to restore competency and the First Circuit has not addressed the issue.  In *United States v. Gomes*, the Second Circuit held that all relevant findings must be supported by clear and convincing evidence.  387 F.3d 157, 160 (2d Cir. 2004); *accord United States v. Palmer*, 507 F.3d 300, 303 (5th Cir. 2007); *United States v. Bradley*, 417 F.3d 1107, 1113 (10th Cir. 2005); *but see United States v. Ghane*, 392 F.3d 317, 319 (8th Cir. 2004) (declining to rule whether the standard is more likely than not or clear and convincing).  In the circuits where the standard has not been decided at the court of appeals level, most district courts have adopted the clear and convincing standard, recognizing the vital constitutional liberty at stake.  *See, e.g.*, *United States v. Grape*, 509 F. Supp. 2d 484, 494 (W.D. Pa. 2007); *United States v. Wood*, 459 F. Supp. 2d 451, 457 n.2 (E.D. Va. 2006).  Consistent with the emerging rule, this Court will apply a clear and convincing standard to the Government's burden of proof.

### C. The First *Sell* Criterion:  Important Governmental Interests

In *Sell*, the Supreme Court stated that the Government has an important interest "in bringing to trial an individual accused of a serious crime."  539 U.S. at 180.  However, *Sell* directed trial courts to consider the "facts of the individual case," including the impact a "lengthy confinement in an institution for the mentally ill" would have on "the strength of the need for prosecution."  *Id.*  Unfortunately, there is no historical or evidentiary support for the hope that Mr. Burhoe will recover spontaneously without medication.  If he is not medicated he may face a long period of confinement under § 4246.  This fact moderates the risk associated with failing to

force medication at this time. *See id.* at 180, 186. However, as the *Sell* Court observed, "civil commitment is [not] a substitute for a criminal trial." *See id.* at 180. In Mr. Burhoe's case, it is now nearly two and one half years since the offense alleged in the Indictment took place, and further significant delay enhances the possibility that the prosecution will be compromised by passage of more time. *See id.* at 180 (stating that "it may be difficult or impossible to try a defendant who regains competence after years of commitment during which memories may fade and evidence may be lost").

Here, the charge is possession of a firearm by a person previously involuntarily committed to a mental health institute, an alleged violation of 18 U.S.C. § 922(g)(4). This crime is potentially very serious and carries significant potential penalties. *See United States v. Dumeny*, 295 F. Supp. 2d 131, 132 (D. Me. 2004); 18 U.S.C. § 924(a)(2) (providing a penalty of imprisonment for not more than ten years). Other courts have considered the maximum statutory penalty in determining whether a crime is sufficiently serious to meet the first *Sell* prong. *United States v. Green*, 532 F.3d 538, 549 (6th Cir. 2008); *United States v. Evans*, 404 F.3d 227, 237-38 (4th Cir. 2005) (concluding that a maximum statutory penalty of ten years warrants a finding of seriousness to support a *Sell* order). Mr. Burhoe has been in federal custody for an extended period for which he will likely receive credit if convicted and sentenced for the federal offense. Under *Sell*, this factor militates against involuntary medication. *Sell*, 539 U.S. at 180, 186 (stating that "because a defendant ordinarily receives credit toward a sentence for time served [such time] . . . moderate[s] . . . the importance of the governmental interest"). The weight of this consideration is limited, however, given that the maximum statutory penalty for violation of 18 U.S.C. § 922(g)(4) is much greater than the time Mr. Burnhoe has been confined.

Whether a court should consider the potential Guideline sentence range in evaluating the seriousness of the crime is an open question. *Compare Green*, 532 F.3d at 548-50, *with Evans*, 404 F.3d at 237-38. Here, the Guideline range of sentence is unclear. The mere possession of a firearm in violation of § 922(g)(4), if a defendant accepts responsibility and fits in Criminal History Category I, could be as low as 10 months; however, § 2K2.1 contains numerous enhancements some of which might apply to Mr. Burhoe's case and would cause the guideline range to escalate dramatically. *See* U.S.S.G. § 2K2.1(c)(1). The guideline range in Mr. Burhoe's case is too speculative to be useful.

The potential seriousness of the pending federal charge is enhanced by pending state charges that arose from his alleged firearm possession. The October 25, 2007 forensic evaluation states that Mr. Burhoe "was shot by police in June 2006 during an altercation related to the current charge." Gov't Ex. 3 at 3; *see Mot. for Pretrial Psychiatric Evaluation* at 1 (Docket # 8). The state charges include aggravated attempted murder and reckless conduct with a firearm arising out of an incident in which Mr. Burhoe allegedly fired a rifle at a state trooper. *Gov't's Resp. to Def.'s Mot. to Reconsider Order for Competency Evaluation* at Ex. 1 ¶ 1, *State's Mot. for Mental Examination Pursuant to Title 15 M.R.S.A. § 101-B* (Docket # 19-2).

The Government's interest is strengthened by Mr. Burhoe's history of an assault against his father, which led to an earlier involuntary hospitalization. The Court notes that this assault was triggered by an incident involving his asserted misuse of a firearm and the state of Maine's decision to remove firearms from him.

The Court concludes that the Government has demonstrated that Mr. Burhoe faces a criminal charge that is serious within the meaning of the first *Sell* criterion.

### D. Second *Sell* Criterion – Whether Involuntary Treatment Will Significantly Further the Governmental Interests

The Court readily finds by clear and convincing evidence that Mr. Burhoe has been properly diagnosed with schizophrenia, paranoid type. The Court also finds by clear and convincing evidence that antipsychotic medication is the preferred and necessary course of therapy for the effective treatment of schizophrenia, and there is no reason to find that Mr. Burhoe will be restored to competency absent the administration of the recommended medications. The Court acknowledges the medical risks associated with the medications and takes those risks seriously. Nevertheless, the Court relies upon the assurances of the medical experts that, except in extremely rare circumstances, the risks can be minimized and effectively treated, and it notes that, conversely, the risk of doing nothing carries a separate set of grave risks. Finally, the Court acknowledges Mr. Burhoe's legitimate concern that the medication will unduly sedate him, thereby affecting his ability to understand the nature and consequences of the proceedings against him and his ability to assist properly in his defense. However, the Court is persuaded by the evidence that the health care professionals will carefully monitor the administration of medication and will adjust the medication to minimize the sedating impact of the protocol.

Mr. Burhoe's attack on the credibility and professionalism of Dr. Grant is misplaced.[3] Mr. Burhoe contends that Dr. Grant's presentation "suggests a troubling lack of familiarity bordering on the nonchalant." *Addendum to Def.'s Closing Argument in Sell Hr'g* at 4 (Docket # 106). He argues that Dr. Grant's "lack of familiarity with Mr. Burhoe undermines the Butner report and Dr. Berger's recommendation as a whole." *Id.* But, there is no evidence at all that Mr. Burhoe has been improperly diagnosed as paranoid schizophrenic. This diagnosis has been

---

[3] Having reviewed the detailed reports co-authored by Dr. Grant and having had the opportunity to observe her testify, the Court finds that she acted appropriately and professionally throughout her dealing with the Defendant.

made historically and has been confirmed by mental health professionals other than Dr. Grant. Thus, the accuracy of Mr. Burhoe's diagnosis does not depend upon Dr. Grant's concurrence.

Dr. Grant also concurred with the other mental health professionals that Mr. Burhoe would likely benefit from an intensive course of antipsychotic medication. But, here, she was not alone. The recommendation for medication was thoroughly supported by references to the professional literature and the evidence was overwhelming that the administration of antipsychotic medication is the treatment of choice for schizophrenics like Mr. Burhoe.

The area of true dispute was not the diagnosis, the recommended treatment, or even the likelihood that Mr. Burhoe would benefit, but the difficult balance between Mr. Burhoe's significant liberty interest in avoiding the administration of unwanted drugs and the nature of and rationale for the governmental invasion of that interest. This narrower question, focused on whether Mr. Burhoe should be forced to take medication appropriate for his psychiatric diagnosis against his will, requires a balancing of the risks and benefits of the medication, an issue generally beyond Dr. Grant's expertise as a psychologist and within Dr. Berger's expertise as a psychiatrist. Mr. Burhoe's objections to Dr. Grant's opinions miss the mark.

### E. Third *Sell* Criterion – Whether Involuntary Medication is Necessary to Further the Government Interest

Based on the evidence at the *Sell* hearing, including the testimony of the mental health experts, the Court finds by clear and convincing evidence that the only acceptable means of treatment for Mr. Burhoe is the administration of antipsychotic medicine. The alternative forms of therapy have not proven to be effective in the past for Mr. Burhoe, nor is there any realistic hope they will be effective in the future. The Court also concludes that other legal means of obtaining Mr. Burhoe's voluntary consent, such as use of a court order backed by the contempt power, are unlikely to be successful and are likely to result only in further delay in the resolution

of his case.  The Court accepts the representation of the Butner mental health professionals that they will attempt to obtain Mr. Burhoe's voluntary consent to the recommended medication protocol and will only undertake forced medication if he maintains his objection.

*Sell* also requires that the Court consider "less intrusive means for administering the drugs."  *Sell*, 539 U.S. at 181.  Here, the report describes a gradually escalating invasion of Mr. Burhoe's person, beginning with efforts at achieving voluntary cooperation, increasing to forcing his mouth open and inserting medicine, and ending, if necessary, with intensely invasive techniques, such as strapping him down to make intramuscular injections and even using a nasogastric tube to administer the medication.  The vision of these procedures is vivid and disturbing and runs substantially contrary to Mr. Burhoe's "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause." *Washington*, 494 U.S. at 221-22.

To minimize the resort to the most invasive of these procedures, the Court will require medical personnel to use their best efforts to convince Mr. Burhoe to voluntarily accept the recommended medication and to escalate the degree of restraint and invasion only as absolutely essential to the treatment protocol.

Mr. Burhoe's counsel has repeatedly insisted that there are members of his family who have a special rapport with the Defendant and who might be able to convince him to do what no one else can.  Mr. Burhoe has presented no evidence to support these claims; for example, none of his family members testified at the *Sell* hearing.  Further, contacting his family members to discuss his condition would likely violate his right of privacy, unless he consents, which presumes his competence to do so, and thus chases a legal tail.  Therefore, the Court does not order the health care professionals to pursue this avenue before forced medication.  At the same

18

time, if there are means by which his family members can be involved without violating his right of privacy, the Court suggests, but does not require, that the parties explore whether, as defense counsel has recommended, there is a means by which his family members can become involved consistent with the Defendant's right of privacy.

### F.  Fourth *Sell* Criterion – Medical Appropriateness

Based on the evidence at the *Sell* hearing, including the testimony of the mental health experts, the Court finds by clear and convincing evidence that the recommended treatment of Mr. Burhoe is medically appropriate.  The Court is persuaded that the mental health professionals at Butner have considered alternative medications and have focused only on those medications that are appropriate to treat his psychiatric condition.

### G.  Summary

Having reviewed each *Sell* criterion, the Court concludes that the Government has established each criterion by clear and convincing evidence.  The Court does not take lightly an order compelling Mr. Burhoe to undergo an invasive medical protocol to which he has steadfastly maintained his objection.  Nevertheless, having had the opportunity to observe Mr. Burhoe, it is clear that he is currently suffering from the absence of treatment and the Government has convinced the Court that applying the *Sell* criteria, this Order is the only means by which Mr. Burhoe is likely to be restored to competence.

## III.   CONCLUSION

The Court GRANTS the Government's motion for the involuntary administration of medication to the Defendant (Docket # 93) in a manner consistent with the recommendations set forth in the Government's experts' reports.  The Defendant is hereby committed to the custody of

the Attorney General for an additional 120 days pursuant to 18 U.S.C. § 4241(d) for treatment consistent with this Order to restore the Defendant's mental competence to stand trial.

    SO ORDERED.

                                                        /s/ John A. Woodcock, Jr.
                                                        JOHN A. WOODCOCK, JR.
                                                        UNITED STATES DISTRICT JUDGE

Dated this 25th day of September, 2008