UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR-06-57-B-W |
| | ) | |
| WILLIAM C. BURHOE | ) | |

**ORDER ON GOVERNMENT'S MOTION FOR AN ORDER PERMITTING THE INVOLUNTARY ADMINISTRATION OF MEDICATION TO RESTORE THE DEFENDANT'S COMPETENCY TO STAND TRIAL**

Applying for a second time the *Sell* factors to William C. Burhoe, the Court concludes that the Government has proven each factor by clear and convincing evidence. The Court orders Mr. Burhoe to undergo a regimen of prescribed psychotropic medication to restore his competency.

I.    STATEMENT OF FACTS

   A.    Background

The immediate genesis of William C. Burhoe's long saga with the federal law began on September 7, 2006, when a federal grand jury indicted him for possession of two firearms after having been previously committed to a mental institution, an alleged violation of 18 U.S.C. § 922(g)(4). As the charge in the indictment suggests, Mr. Burhoe's psychological condition immediately became a central issue, and after a series of motions and orders, the Court held a *Sell* hearing on July 7, 2008 to determine whether Mr. Burhoe should be involuntarily medicated. *See Sell v. United States*, 539 U.S. 166 (2003). On September 25, 2008, the Court granted the Government's motion for involuntary medication of Mr. Burhoe. *Order on* Sell *Hearing* (Docket # 108) (*First* Sell *Order*).

On April 6, 2009, the Court received a psychiatric report from the Bureau of Prisons, stating that Mr. Burhoe had undergone a recommended regimen of medication and had been restored to competency. On May 13, 2009, the Court held a competency hearing. Mr. Burhoe appeared with counsel and the Court determined, based on Mr. Burhoe's appearance and on the psychiatric reports, that Mr. Burhoe had regained competency. The Court arraigned Mr. Burhoe directly after that hearing. After more than three years, the case was finally placed on a regular court schedule and began to move forward. Mr. Burhoe filed a motion to suppress and the case appeared on trial lists. *Def.'s Mot. to Suppress Confession* (Docket # 133).[1]

On July 10, 2009, however, Mr. Burhoe's counsel filed a motion for a hearing to determine competency. *Def.'s Mot. for Hearing to Determine Competency* (Docket # 146) (*Def.'s Mot.*). The motion stated that Mr. Burhoe had been examined by Dr. Bruce Kerr, a clinical psychologist, and that Dr. Kerr had found Mr. Burhoe unable to form a factual and rational understanding of the proceedings against him and unable to consult with his attorney about his case on a reasonably rational basis. *Id.*[2] Upon referral by the Court, the Magistrate Judge held a hearing on July 20, 2009 and on the same day, issued a Recommended Decision in which she recommended that the Court find Mr. Burhoe incompetent. *Recommended Decision.* (Docket # 157). On July 23, 2009, the Court adopted the Magistrate Judge's recommendation, concluded that Mr. Burhoe had lapsed back into incompetency, and ordered that Mr. Burhoe be committed to the custody of the Attorney General for treatment. *Order Affirming the Recommended Decision of the Magistrate Judge and Order for Psychiatric or Psychological Examination* (Docket # 159).

---

[1] Mr. Burhoe's motion to suppress raises his psychological condition in a different context. The motion questions whether his statements while in the hospital in police custody were knowing and voluntary and whether he was able to knowingly, voluntarily, and intelligently waive *Miranda* warnings. *Def.'s Mot. to Suppress Confession* at 1-3.
[2] Mr. Burhoe's motion misidentifies Dr. Kerr as a medical doctor. *Def.'s Mot.* at 1. Dr. Kerr is a licensed clinical psychologist. *Tr. of Proceedings* at 3:17-18 (Docket # 191) (*Tr.*)

After another period of hospitalization, the doctors at the Federal Medical Center in Butner (Butner) concluded in their report that Mr. Burhoe was incompetent and would likely regain competence if treated with appropriate psychotropic medication. *See Gov't's Mot. for an Order Permitting the Involuntary Administration of Medication to Restore the Def.'s Competency to Stand Trial* (Docket # 171) (*Gov't's* Sell *Mot.*). Mr. Burhoe again objected to the recommended course of psychotropic medication.

On November 16, 2009, the Government moved for a second *Sell* order to authorize involuntary medication for Mr. Burhoe. *Id.* Mr. Burhoe objected. *Def.'s Resp. to Gov't's Mot. for an Order Permitting the Involuntary Administration of Medication to Restore the Def.'s Competency to Stand Trial* (Docket # 176). The Court held the second *Sell* hearing on January 8, 2010. The Court received the testimony of Jill R. Grant, Psy. D.; Bruce R. Berger, M.D.; and Mr. Burhoe through videoconference.[3]

Following the hearing, the Court ordered the parties to produce the report of Dr. Kerr and to obtain a transcript of the July 20, 2009 hearing before the Magistrate Judge. *Order Requesting the Report of Dr. Bruce B. Kerr and a Transcript of His Testimony During the Competency Hearing Held on July 20, 2009* (Docket # 189). Mr. Burhoe did not object. *Def.'s Resp. to Court's Order Requesting Report of Dr. Bruce Kerr and Testimony Transcript of 7/20/09 Competency Hearing* (Docket # 190). Dr. Kerr's report was filed on January 13, 2010 and a transcript of the July 20, 2009 hearing was filed on January 15, 2010.

The Court also allowed Mr. Burhoe to keep the record open for two weeks in order to file medication records from the Somerset County Jail. On January 22, 2010, Mr. Burhoe moved to extend the time to February 26, 2010. *Def.'s Unopposed Mot. to Extend Time for Filing Records*

---

[3] To accord Mr. Burhoe his right to counsel, the Court approved the request of Mr. Burhoe's counsel to be present in Butner during the videoconference testimony.

*in Hearing on Gov't's Mot. for Involuntary Medication* (Docket # 192). On January 25, 2010, the Court granted the Defendant's motion. *Order* (Docket # 193). On February 4, 2010, Mr. Burhoe filed a supplemental memorandum, addressing the significance of the Somerset County medication records. *Def.'s Supplemental Mem. on Gov't's Mot. for an Order Permitting the Involuntary Administration of Medicaiton to Restore the Def.'s Competency to Stand Trial* (Docket # 198) (*Def.'s Supplemental Mem.*). On February 5, 2010, the Government requested a conference of counsel, which was held on February 22, 2010. *Letter to Court* (Docket # 199).

At the February 22, 2010 conference, the Government produced a supplemental affidavit from Dr. Berger dated February 16, 2010 and asked that the Court receive it into evidence. Mr. Burhoe objected, saying that the record had closed. Noting that the Court kept the record open at his request to allow for evidence of medication at the Somerset County Jail, the Court overruled Mr. Burhoe's objection since the new Dr. Berger affidavit responded to Mr. Burhoe's additional evidence. Although the Court admitted the Dr. Berger affidavit, it ruled that the Court would keep the record open to allow Mr. Burhoe, if he wished to do so, to cross-examine Dr. Berger regarding his newly expressed opinions. On March 3, 2010, Mr. Burhoe waived his right to cross-examine Dr. Berger and moved to close the record on the *Sell* hearing. *Def.'s Mot. for Waiver of Cross-examination of Dr. Berger and Closure of* Sell *Hearing* (Docket # 207). The Government did not oppose this motion. On March 4, 2010, the Court granted Mr. Burhoe's motion to close the *Sell* hearing. *Order* (Docket # 209).

### B. Dr. Kerr's Opinion

To piece together what happened between the spring of 2009 and the winter of 2010, the Court begins with the competency hearing of May 13, 2009. When Mr. Burhoe appeared before the Court on May 13, 2009, he had undergone a lengthy period of intensive psychotropic

therapy. Based on the Court's observations, and the conclusions in the expert reports, he seemed fully competent. Later that spring, Dr. Kerr, a clinical psychologist for the defense, met twice with Mr. Burhoe. On June 18, 2009, Dr. Kerr had found Mr. Burhoe to be "quietly cautious and suspicious," but Mr. Burhoe had not shown "the frank agitation and hostility that he demonstrated at the second meeting eleven days later." *Report of Bruce B. Kerr, Ph.D.* at 2.

On June 29, 2009, however, when Dr. Kerr met with Mr. Burhoe again, Mr. Burhoe had markedly deteriorated. Dr. Kerr's report states that Mr. Burhoe was "quite agitated and paranoid. His thoughts were racing and his speech was rapid, angry, pressured, ranting, and at times difficult to follow. He was obsessed with his legal representation . . . ." *Id.* at 1. Dr. Kerr's report suggests that Mr. Burhoe's condition had deteriorated despite the fact he was still taking the prescribed psychotropic medication. *Id.* at 2. He thought that Mr. Burhoe's mental condition "may be quite variable" and predicted that it might be "difficult . . . to know on any given occasion what his mental condition will be like." *Id.* at 3. He surmised that the variability "may have some correlation with the degree of stress that he is under, as well as his medication compliance and the natural rhythms of his own severe mental illness." *Id.* Dr. Kerr testified at the competency hearing on July 20, 2009 in a manner generally consistent with his report. *Tr.*

C.   **The Second *Sell* Hearing**

During her testimony at the January 8, 2010 *Sell* hearing, Dr. Jill Grant reviewed Mr. Burhoe's history. She noted that after the Court issued the first *Sell* order on September 25, 2008, Mr. Burhoe did not want to take the medicine, but he agreed to do so when apprised of the court order. Over time, Mr. Burhoe responded well to the medication, a course of Risperdal; he became less hostile and irritable, he talked rationally, and by March 2009, he had no psychiatric

5

symptoms at all.[4]  On March 9, 2009, Dr. Grant co-authored a forensic evaluation that concluded that "Mr. Burhoe's competency has been restored with medication." *Gov't's Hearing* Ex. 6 at 6 (Docket # 188).

By the time he was readmitted to Butner in August 2009, Mr. Burhoe's condition had changed.  He was not taking his medication and he was unpredictable.  At times calm, he was intermittently irritable and hostile.  Dr. Grant testified that he was ultimately placed in a secure unit due to concern for staff safety.  The diagnosis continued to be paranoid schizophrenia and Dr. Grant opined that Mr. Burhoe had no insight into his mental illness.  She said that, as before, the treatment of choice is psychotropic medication, which has proven beneficial in the past.  She noted that when compliant with his medication regimen, Mr. Burhoe had not complained of side effects and had no other complaints.  Dr. Grant acknowledged that when Mr. Burhoe was not taking the medicine, he objected to taking it, and complained that it made him feel sluggish, but she said that he made no similar complaints when taking the medicine.

Dr. Berger confirmed Mr. Burhoe's paranoid schizophrenia diagnosis and he expressed the opinion that anti-psychotic medicine is essential for effective treatment.  He agreed that "talking therapy" could be useful but only as an adjunct to medication.  He said the only alternatives to medication were continued confinement and enduring psychiatric symptoms.  Dr. Berger agreed that Mr. Burhoe had responded well to the last round of psychotropic therapy, except that he had little insight about his illness and his need for treatment.  Dr. Berger also echoed Dr. Grant's observation that Mr. Burhoe did not complain about the side-effects of the medicine when he was taking it but complained of numbness, sluggishness, and urinary retention when he was not.  Dr. Berger conceded that given a choice, Mr. Burhoe would likely not take

---

[4] Risperdal, a trade name, is also referred to as risperidone.

any medicine because Mr. Burhoe does not believe he has a psychiatric condition that requires medication, and if not required to take medicine, he will probably stop.

After the doctors testified and left the hearing room, Mr. Burhoe testified. Mr. Burhoe said that he disagreed with the doctors' medication recommendations. He said the Risperdal did not help his thought processes; instead, the medicine troubled his heart, blurred his vision, gave him internal soreness, and made him feel generally miserable inside. He also said that he had experienced other side effects, including a weakness in his heart muscles, other muscular issues, sore urination, constipation, dry throat, diminished mental capacity, and a tendency to chew his tongue raw. He testified that he was prescribed another drug that he referred to as "cogenic" to alleviate tongue chewing. When he was taking the Risperdal, he said all he wanted to do was to go to bed and pray for the end of his suffering. He acknowledged that he had not complained because he thought the staff at Butner had too much to do. However, the stress from taking the medicine increased as time went on.

Mr. Burhoe said that the custodial move from North Carolina to Maine was terrible. He was taken from state to state and placed in a variety of facilities on his way north: Virginia, Philadelphia, Brooklyn, New Hampshire, Portland, and Bangor. He was placed in the midst of criminals and described the experience as terrifying.

Mr. Burhoe insisted that he is currently competent to stand trial, to assist his attorney in his defense, and to make decisions. He said that he had stopped taking Risperdal only one week before arriving back at Butner in early August: so in effect, the July determination of incompetence occurred when he was taking the medicine. Over the last month, during which he has not taken the medicine, he feels much better and has gotten "good relief."

Left open was whether Mr. Burhoe had, in fact, continued to take psychotropic medicine during the late spring and summer of 2009 as he lapsed into psychological difficulty. If he had stopped, there would be a more obvious link between his cessation of the medication and his mental deterioration; if he had continued to take risperidone and still deteriorated, there would be a question as to whether the medicine was effective in remitting his symptoms. The records submitted after the hearing by Mr. Burhoe confirm that he continued to take the prescribed medicine even during the time he decompensated. *Def.'s Supplemental Mem.* Ex. 1-4.

Dr. Berger's affidavit dated February 16, 2010 responded to this new information. *Aff. of Dr. Bruce R. Berger*, Gov't Ex. 9. Dr. Berger explained that after the Court's September 25, 2008 Order, Mr. Burhoe was administered 2 mg per day of risperidone, which he described as "at the low end of the dosing range." *Id.* ¶ 3. Assuming Mr. Burhoe continued to take risperidone in the recommended dose from June to August, 2009, Dr. Berger said his opinion remained unchanged. *Id.* ¶ 4. Dr. Berger explained that Mr. Burhoe's medication needs

> can change depending on a number of variables. Those variables can include the setting in which the patient is in, the anxiety or stress that a patient is experiencing, and the patient's acclimation to a certain dose of medication. A patient may require a higher or lower dose of medication or a different medication.

*Id.* ¶ 5.

## II. DISCUSSION

### A. The *Sell* Factors

Under *Sell*, the Court must consider four factors before ordering the involuntary medication of a defendant: (1) the court must find "*important* governmental interests are at stake"; (2) the court must conclude that "involuntary medication will *significantly further* those concomitant state interests"; (3) the court must conclude that "involuntary medication is

8

*necessary* to further those interests"; and, (4) the court must conclude that "administration of the drugs is *medically appropriate*, i.e., in the patient's best medical interest in light of his medical condition." 539 U.S. at 180-81 (emphasis in original).

### B.  *Washington v. Harper*

The Supreme Court emphasized, however, that before proceeding to this analysis, courts should consider whether forced medication is warranted "for a *different* purpose, such as the purposes set out in *Harper* related to the individual's dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his health gravely at risk." *Id.* at 181-82 (referring to *Washington v. Harper*, 494 U.S. 210 (1990)).  In *Harper*, the Supreme Court found constitutional a Washington state policy that allows prison officials to administer medication to inmates against their will if a psychiatrist determines that the inmates need the medication and the inmates suffer from a mental disorder and are gravely disabled or present a likelihood of serious harm to themselves, others, or their property.  *Harper*, 494 U.S. at 215. Despite Dr. Grant's testimony that Mr. Burhoe had been moved to a secure unit out of concern for staff safety, the doctors' November 9, 2009 report states that "[b]ecause he can be safely managed on an open mental health housing unit and is not considered to be gravely disabled or an imminent risk of danger to others due to mental illness, he does not meet criteria for involuntary treatment pursuant to the Harper criteria." *Gov't's Hearing* Ex. 7 at 6.  The Court accepts this expert conclusion.

### C.  **Burden of Proof**

In its earlier *Sell* order, in the absence of First Circuit authority, the Court imposed the burden on the Government to prove each *Sell* criterion by clear and convincing evidence based on *United States v. Gomes*, 387 F.3d 157, 160 (2d Cir. 2004).  Although the First Circuit has not

9

yet addressed the appropriate burden of proof for a *Sell* order, other circuits have joined the Second Circuit and adopted the clear and convincing standard. *See United States v. Fazio*, No. 08-3900, 2010 WL 724664, at *4 (8th Cir. Mar. 4, 2010); *United States v. Bush*, 585 F.3d 806, 814 (4th Cir. 2009); *United States v. Grape*, 549 F.3d 591, 604 (3d Cir. 2008); *United States v. Green*, 532 F.3d 538, 545 (6th Cir. 2008); *United States v. Bradley*, 417 F.3d 1107, 1114 (10th Cir. 2005). The Court places the burden on the Government to prove each *Sell* criterion by clear and convincing evidence.[5]

### D. The First *Sell* Criterion: Important Governmental Interests

In its September 25, 2008 *Sell* Order, the Court reviewed this criterion and concluded that the Government had established by clear and convincing evidence an important governmental interest. *First* Sell *Order* at 13-15. Although the length of time Mr. Burhoe has remained in custody has increased, the facts underpinning the governmental interests remain substantially unchanged. Those facts include 1) the seriousness of the charge and potential penalties; 2) the uncertainty of the Guideline calculation; and 3) the pending state charges arising out of the same incident that brought about the federal charge. *Id.* at 13-15. To reiterate the allegations surrounding Mr. Burhoe's arrest in June 2006, Mr. Burhoe allegedly fired a rifle at a state trooper and ultimately was shot by the police, and there are state charges pending for aggravated attempted murder and reckless conduct with a firearm. *Id.* at 15. Further, the indictment alleges that Mr. Burhoe had previously been involuntarily committed to a mental institution. Accordingly, consistent with its earlier Order, the Court finds that the Government has

---

[5] The clear and convincing standard of proof applies only to factual findings, and the Second, Fourth, Fifth, Sixth, Eighth, Ninth, and Tenth Circuits have concluded that the first *Sell* criterion is a legal, not a factual question. *Fazio*, 2010 WL 724664 at *4; *Green*, 532 F.3d at 551; *United States v. Hernandez-Vasquez*, 513 F.3d 908, 915-16 (9th Cir. 2008); *United States v. Palmer*, 507 F.3d 300, 303 (5th Cir. 2007); *United States v. Evans*, 404 F.3d 227, 236 (4th Cir. 2005); *Bradley*, 417 F.3d at 1113-14; *Gomes*, 387 F.3d at 160. The First Circuit has not yet addressed this question. Although the circuit trend seems clear, rather than guess what the First Circuit might rule, the Court has applied a clear and convincing standard of proof to the first factor to the extent it has made factual findings.

established by clear and convincing evidence an important governmental interest in Mr. Burhoe's case.

### E. Second *Sell* Criterion: Whether Involuntary Treatment Will Significantly Further the Governmental Interests

In addition to the Court's findings in its earlier *Sell* order, the Court now has evidence that the earlier period of mandated anti-psychotic medication was effective in alleviating Mr. Burhoe's psychological symptoms. Unlike the evidence at the prior *Sell* hearing, when the mental health professionals were predicting what was likely to happen if Mr. Burhoe underwent a course of psychotropic therapy, Drs. Grant and Berger base their current recommendations on what did happen: Mr. Burhoe actually responded to the medication. If the Court accepts the testimony of the government professionals, the Court would readily conclude that Mr. Burhoe's past recovery is likely to recur with the same treatment.

Mr. Burhoe emphatically disagrees. First, Mr. Burhoe emphasizes the horrible side effects he experienced while taking the medicine. Second, he challenges the effectiveness of the Risperdal. Mr. Burhoe observes that he continued to take Risperdol from 2008 until just before returning to Butner in August 2009, so he was fully medicated in June and July 2009 when Dr. Kerr and the Court found him incompetent. Moreover, despite the fact he has not taken Risperdal since arriving at Butner in August 2009, Mr. Burhoe testified in a clear and lucid fashion at the January 8, 2010 *Sell* hearing.

Based on the Somerset County Jail records, the Court concludes that during the period he deteriorated mentally, Mr. Burhoe continued to take the prescribed medication at the Somerset County Jail at the recommended dose of 2 mg daily.[6] This conclusion, however, does not resolve whether the Court should order Mr. Burhoe to reinstitute the medication regimen

---

[6] Mr. Burhoe skipped some doses, but there is no evidence that his missed medication played a significant role in his deterioration.

11

recommended by the Butner doctors. Even if Mr. Burhoe became incompetent despite the medication, the record establishes that the medication initially restored him to competency. Similarly, the record confirms that absent medication, Mr. Burhoe might never regain competency to stand trial (he did not become competent for the two years he was not medicated prior to the previous *Sell* order). Dr. Kerr and Dr. Berger agree that Mr. Burhoe's mental health is subject to fluctuations, even when he is medicated: Dr. Kerr described "windows of competency" and Dr. Berger explained that Mr. Burhoe's response to the medication depended upon a number of variables. Based on the experts' testimony, the solution should be recalibration of medication, not its cessation. The initial success of the medication convinces the Court that Mr. Burhoe would benefit from another round.

The Court is concerned about Mr. Burhoe's vivid assertions that he experiences physical pain while on the recommended medicine, but it does not know quite what to make of them. At the competency hearing on May 13, 2009, Mr. Burhoe mentioned several physical complaints that he attributed to the risperidone, including feeling miserable, sensing that his tongue was swollen and sore, having stomach pain, and being tired midday. At the same time, he said that the medication did not affect his mental processes. He reiterated these and other more dramatic physical sequelae from the medication during the January 8, 2010 *Sell* hearing. Drs. Grant and Berger opined that his recitation of physical symptoms is consistent with his underlying psychiatric disease. Be that as it may, the Court remains troubled that Mr. Burhoe feels that the risperidone causes him physical discomfort and urges the Butner mental health professionals to monitor Mr. Burhoe and act to alleviate any physical side effects from the risperidone.

In sum, the Court concludes that the Government has proven the second *Sell* prong by clear and convincing evidence.

### F. Third *Sell* Criterion: Whether Involuntary Medication Is Necessary to Further Those Interests

In its earlier Order, the Court discussed this issue and it adopts for purposes of this decision paragraphs one through three of that discussion. *First* Sell *Order* at 17-18. Based on the testimony of Dr. Berger, the Court determines that "talk therapy" and other less invasive alternative forms of treatment will not be effective in treating Mr. Burhoe's paranoid schizophrenia. *Sell*, 539 U.S. at 181 (stating that the court "must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results").

The description of the forcible administration of Risperdal is disturbing. *First* Sell *Order* at 18. However, based on Mr. Burhoe's response to the first *Sell* order and his testimony on January 8, 2010, the Court anticipates that Mr. Burhoe will again voluntarily submit to the medication regimen and the Butner personnel will not be required to forcefully administer the medication.

Finally, the *Sell* Court encourages courts to exercise the least amount of judicial authority necessary to encourage defendants to accept prescribed medication without physically forcing them to ingest the medicine. *Sell*, 539 U.S. at 181 (stating that the court "must consider less intrusive means for administering the drugs, *e.g.*, a court order to the defendant backed by the contempt power"). In compliance with *Sell*, the Court considered issuing an order backed by the contempt power as a less forceful exercise of judicial authority. However, the Order in this case will likely have the same effect as an order backed by the contempt power since Mr. Burhoe has indicated that he will abide by a court order and take the medicine. If Mr. Burhoe changes his mind and refuses to take the prescribed medicine, this Order will become necessary. The Court concludes that the Government has proven the third *Sell* criterion by clear and convincing evidence.

### G. Fourth *Sell* Criteria: Whether Involuntary Medication is Medically Appropriate

Based on the testimony at the second *Sell* hearing and taking into account the contents of the earlier *Sell* order, the Court concludes that the Government has proven the fourth *Sell* criterion by clear and convincing evidence.

### H. Other Considerations

#### 1. Limited Alternatives

Mr. Burhoe views the question of whether he should be forced to take a psychotropic medication against his will as a matter of "basic human dignity":

> Mr. Burhoe honored the Court's order to take the Risperdal (somewhat heroically, given the circumstances). In fairness, the government and the Court now owe Mr. Burhoe the basic human dignity of being able to choose between his present mental state and Risperdal's misery.

*Def.'s Mot. for Waiver* at 3. The Court is keenly sensitive to Mr. Burhoe's right of privacy and respectful of his wish to maintain the integrity of his own body. But the resolution of this motion is not so simple.

First, there is the inescapable fact of a pending federal charge against Mr. Burhoe and this charge must ultimately be resolved. Absent a motion to dismiss from the prosecutor, Mr. Burhoe must be restored to competency. Even though Mr. Burhoe demonstrates a degree of competency while unmedicated, the history of this case reveals that when unmedicated, he becomes unpredictable, suspicious, and paranoid. It is true that even when medicated Mr. Burhoe periodically displays symptoms of paranoid schizophrenia. Although acknowledging these difficulties, the goal must be to restore Mr. Burhoe to competency for long enough to allow the criminal case to run its course. If the Court were able to conclude that there was a way to

14

accomplish this result without medication, it would do so, but the history of this case has demonstrated precisely the opposite.

Second, although Mr. Burhhoe demands in evocative language to be left alone, it is unlikely that this is a realistic alternative. If the federal charge were to disappear tomorrow, he would still face serious state criminal charges, and the state criminal justice system would be required to address exactly the same questions of competency and involuntary administration of medication that this Court is currently facing.

Third, if the Court rejects the Government's motion for involuntary medication, the next step could well be a proceeding for hospitalization under 18 U.S.C. § 4246. The Court will not speculate what the final result of such a proceeding would be, but the statute authorizes commitment for such period of time that a defendant is "suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another or serious damage to property of another." 18 U.S.C. § 4246(d). If the Government were able to demonstrate by clear and convincing evidence that Mr. Burhoe meets these criteria, he could face a prolonged psychiatric hospitalization.

Among the alternatives, the Court concludes that a renewed period of risperidone in an effort to restore competency is the path most likely to accord Mr. Burhoe his human dignity.

### 2. Continuity of Care Issues

One intractable question is what happens to Mr. Burhoe once he is restored to competency. There are two sub-issues: travel and continuity of care. Butner is in North Carolina and the district court is in Bangor, Maine, and Mr. Burhoe must travel up the east coast to face further legal proceedings. If he is gradually transported from prison to prison on his way from Butner to Bangor, Mr. Burhoe runs the risk of psychologically deteriorating because it is difficult

to maintain proper doses of prescriptive medication as he moves from place to place and because being dropped overnight into unfamiliar prisons during the trip is unsettling. Once he regains competence, the Court expects counsel to immediately inform the Court so that a conference can be scheduled to discuss how best to bring Mr. Burhoe to Maine.

Once Mr. Burhoe arrives in Maine, it will be essential for Mr. Burhoe to maintain continuity of care to minimize the possibility that he will slide back into incompetency. The Court urges counsel to consult with appropriate treatment providers and to be prepared to present a professionally-reviewed protocol for maintaining Mr. Burhoe's medication regimen and for according him psychiatric and psychological oversight when he returns to Maine.

### 3. Delay

The Court is also increasingly concerned about the length of time this process has taken. Mr. Burhoe has now been under indictment for over three years, and he has only been arraigned; for much of this time he has been detained at Butner. Even when he is restored to competency, it is unlikely his case will be resolved quickly: his May 28, 2009 motion to suppress remains pending, the resolution of which must await his return to competency and to Maine.

Underlying this extended process, however, is the allegation that Mr. Burhoe's firearm possession was not benign. To the contrary, Mr. Burhoe is alleged to have had a history of violence involving firearms, and the circumstances of his arrest on June 6, 2006 suggest that he represents a danger to himself and others. *See* First *Sell* Order at 15. The Court's concern about this extended process is mitigated to some extent by the seriousness of these allegations. But the Court is anxious that the parties, including the mental health professionals, move with as much dispatch as possible to institute the psychotherapy and to restore Mr. Burhoe to competence.

### I.    Summary

Based on the evidence at the second *Sell* hearing and the history of this case, the Court finds that the Government has established by clear and convincing evidence each of the *Sell* criteria. As in the past, the Court does not take lightly an order compelling Mr. Burhoe to undergo a treatment regimen to which he objects. Despite Mr. Burhoe's earnest objections, the Court remains convinced that for Mr. Burhoe to truly regain competence, it is essential that he submit to a second round of psychotropic therapy. Once he has been restored to competence, the Court urges the professionals at Butner and the attorneys in this case, both for the Government and Defense, to act quickly so that further necessary proceedings can take place within Mr. Burhoe's window of regained competence and this long-delayed case can be fully and finally resolved.

### III.  CONCLUSION

The Court GRANTS the Government's Motion for an Order Permitting the Involuntary Administration of Medication to Restore the Defendant's Competency to Stand Trial (Docket # 171). The Defendant is hereby committed to the custody of the Attorney General for an additional period of 120 days pursuant to 18 U.S.C. § 4241(d) for treatment consistent with this Order.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 9th day of March, 2010